**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*v.*<br>**SEKOU DAVENPORT** | **CRIMINAL ACTION**<br>**NO. 26-40-KSM-1** |

**MEMORANDUM**

**MARSTON, J.** **AUGUST 31, 2026**

Today, the Court is asked a seemingly simple question: is a request to lift one's shirt and "spin" a seizure? On these facts, the answer is no. Defendant Sekou Davenport has been charged with possession of a firearm and ammunition after previously being convicted of a crime punishable by more than a year's imprisonment, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) He now moves to suppress the firearm and ammunition[1] on which the charge is based, arguing that this evidence was obtained through an illegal seizure and search, as well as suppress his post-arrest statements as fruit of the poisonous tree. (Doc. No. 21.)

The Court held an evidentiary hearing on Defendant's motion on July 30, 2026. (*See* Doc. No. 31.) During the hearing, Philadelphia Police Department ("PPD") Officers Kevin Horn and George Weiss testified on behalf of the Government.[2] (*See* Rough Draft July 30, 2026 Hr'g Tr. at 4:01–32:19.) The Government also introduced both PPD officers' body camera footage

[1] Defendant's motion mentions suppression of only the firearm and not the ammunition. (*See generally* Doc. No. 21.) But because the ammunition was allegedly found in the firearm the day of Davenport's arrest (Doc. No. 1 at 1), and the Government responds to the motion as though it seeks suppression of all the evidence obtained, the Court views the motion as seeking suppression of the firearm *and* the ammunition (*see* Doc. No. 25 at 2, 5).

[2] Though both were Government witnesses, only Officer Weiss was called as a witness by the defense. (*See* Rough Draft July 30, 2026 Hr'g Tr. at 25:05–18.)

from the day in question (Gov't Hr'g Exs. 1, 2). And Defendant introduced the transcript from Defendant's preliminary hearing in state court (Def. Hr'g Ex. 1).

For the reasons discussed below, the Court denies Defendant's motion.

## I. FACTUAL BACKGROUND

On Wednesday, October 22, 2025, at approximately 11:40 a.m., Officers Horn and Weiss were on a routine daytime patrol near the 5600 block of Chestnut Street[3], Philadelphia, Pennsylvania. Officer Weiss was driving and Officer Horn was in the passenger seat of their marked police vehicle. (*See* Gov't Hr'g Ex. 2.) Their patrol brought them to the parking lot of the Fresh Grocer, a local supermarket. (*See* Rough Draft July 30, 2026 Hr'g Tr. at 5:07–16.) It was there that the officers encountered Defendant walking through the parking lot wearing a black puffer jacket over a black hoodie with a black bag strapped across his chest. (*See id.* at 5:17–6:07, 18:04–15; *see also* Gov't Hr'g Ex. 1.)

Officer Horn testified that he and Officer Weiss were drawn to Defendant while he walked through the parking lot because, while the officers were driving, Officer Horn noticed "a heavy object in [Defendant's] front hoodie pocket, which was weighing down on the right side." (Rough Draft July 30, 2026 Hr'g Tr. at 6:09–13.) Officer Horn testified he believed, at that time, that the object could potentially be a firearm, but also testified that it was "fair to say" that his belief was a "hunch," especially as he had never seen or interacted with Defendant before nor did Officer Horn believe Defendant was then "involved in any criminal activity." (*See id.* at 10:07–11:07.) The PPD officers then drove up behind Defendant, Officer Weiss honked his horn, and, once Defendant was next to the open passenger side window of the vehicle, Officer Horn asked

[3] At the hearing, Officer Horn identified the address as the 5600 block of Market Street, but as stated in both parties' briefing (*see* Doc. No. 21 at 2; Doc. No. 25 at 2), and confirmed by defense counsel during the hearing (Rough Draft July 30, 2026 Hr'g Tr. at 33:01–14), the grocery store in question is actually located one block over on the 5600 block of Chestnut Street.

Defendant if he had a permit to carry a firearm. (*See id.* at 8:15–18; *see also* Gov't Hr'g Ex. 2 at 11:41:15–24.)[4] Defendant answered that he did not, and continued to walk toward the Fresh Grocer. (Rough Draft July 30, 2026 Hr'g Tr. at 12:19–21 ("Mr. Davenport was not running from you, correct? A. He was not running."); Gov't Hr'g Ex. 2 at 11:41:18–26).

The PPD officers then followed[5] Defendant in their vehicle for approximately 30 seconds, until Defendant was close to the entrance of the Fresh Grocer. (Gov't Hr'g Ex. 2 at 11:41:24–58). At that point, Office Weiss stopped the vehicle, and Officer Horn pointed at Defendant with his right hand, opened the passenger side door, stepped one foot out of the vehicle, and initiated a second conversation with Defendant. (*Id.* at 11:41:59–11:42:04; Gov't Hr'g Ex. 1 at 11:41:57–11:42:01.) In response, Defendant, who was still a few feet ahead of the officers, turned halfway around toward the vehicle and lifted up his hoodie to reveal his waistband. (Gov't Hr'g Ex. 1 at 11:42:02–11:42:04.) Officer Horn then continued to speak with Defendant and "d[id] a twirling motion with [his right] hand," which the officer testified was "a directive to [Defendant] to turn around." (Rough Draft July 30, 2026 Hr'g Tr. at 24:01–02; *see also* Gov't Hr'g Ex. 2 at 11:42:04–11:42:05.) Defendant responded by spinning 360 degrees in a circle. (Gov't Hr'g Ex. 1 at 11:42:05–11:42:07.) At the evidentiary hearing, Officer Horn testified that "[w]hen the Defendant did the 360 spin, I noticed the back of the firearm in the side

[4] This interaction is only captured on Officer Weiss' body camera, not Officer Horn's, (*see* Gov't Hr'g Ex. 2 at 11:41:18–24; Gov't Hr'g Ex. 1) and there is no audio because neither officer had turned on their body camera at that point (*see* Rough Draft July 30, 2026 Hr'g Tr. at 6:23–7:03 ("Explain to the Court how the body worn camera works in terms of when the audio begins versus the video? A. So when you press the button, [the camera] goes back one minute with no audio. And the moment you press it is when the audio kicks on.")). The first audio that appears on either body camera footage begins at 11:42 a.m. and 13 seconds, when Officer Weiss turns on his camera. (*See* Gov't Hr'g Ex. 2 at 11:42:12–14.)

[5] Officer Horn initially testified that the officers were "just driving" in the parking lot, but shortly thereafter admitted that during this period the officers had Defendant "in sight" and were "still following [Defendant]." (*See* Rough Draft July 30, 2026 Hr'g Tr. at 13:15–21; *see also id.* at 15:10–12 ("Q. And then after he walked off you began following him, correct? A. That's correct."); 22:25–26:02 ("Q. Officer Weiss had driven the car and followed Mr. Davenport, is that correct? A. That's correct.").)

of his pocket before he walked away." (Rough Draft July 30, 2026 Hr'g Tr. at 8:08–10; *see also* Gov't Hr'g Ex. 1 at 11:42:07–11:42:08 (showing Officer Horn point at Defendant with his left hand shortly after Defendant completed the spin).) This second interaction took approximately ten seconds. (*See* Gov't Hr'g Ex. 1 at 11:41:58–11:42:08.)

After Defendant spun, he continued walking toward the Fresh Grocer at a normal pace and Officer Horn fully exited his vehicle, walked at a more heightened pace towards Defendant, and grabbed hold of him nine seconds after the end of their second conversation. (*See id.* at 11:42:08–11:42:17.) Officer Horn then physically detained Defendant, reached into Defendant's right hoodie pocket, and retrieved the firearm, a Sarsilmaz, model B6, 9mm semi-automatic pistol, bearing serial number T1102-20E03460, loaded with 14 live rounds of 9mm ammunition. (*Id.* at 11:42:18–11:42:30; Rough Draft July 30, 2026 Hr'g Tr. at 28:14–20.) While this interaction was happening, Officer Weiss activated his body camera, walked up to Defendant, and handcuffed him. (Gov't Hr'g Ex. 2 at 11:42:18–11:42:30.) While he was being handcuffed, Defendant stated that he "didn't do anything," to which Officer Weiss responded that "you can see the mag, bro." (*Id.* at 11:42:28–11:42:33.)

Defendant was then placed under arrest and brought back to the PPD officers' vehicle. (*Id.* at 11:42:45–11:42:56.) While they were walking, Officer Weiss asked Officer Horn if "his [body camera] is on?" and Officer Horn is then heard turning the camera on seconds later. (*Id.* at 11:42:50–11:42:53.) As Defendant sat handcuffed in the back of the PPD officers' vehicle, Officer Weiss asked him, "you already said no to the permit to carry, why you carrying this [gun] man?" to which Defendant responds "safety, that's it." (*Id.* at 11:42:28–11:42:33.)

## II. PROCEDURAL HISTORY

On January 22, 2026, Defendant was indicted by a grand jury and charged with one count of possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1).

(Doc. No. 1.) He now moves to suppress the physical evidence that PPD obtained from his person on the day of the arrest, arguing that the stop violated his Fourth Amendment rights. (Doc. No. 21.) He also moves to suppress the statements he made to PPD officers shortly thereafter. (*Id.*) Specifically, Defendant argues that Officer Horn conducted an investigatory stop of him when Officer Horn began directing him to move around in the Fresh Grocer parking lot, and that such an investigation lacked reasonable suspicion. (*Id.* at 6–13; *see also* Rough Draft July 30, 2026 Hr'g Tr. at 33:01–36:22.) And because Officer Horn lacked initial reasonable suspicion for the stop, all evidence later gathered—including Defendant's statements to the PPD officers while handcuffed and while sitting in the police vehicle—must also be suppressed. (Doc. No. 21 at 13–18.)

The Government opposes the motion. (Doc. No. 25.) It emphasizes that Officer Horn did not conduct an investigatory stop until he physically apprehended Defendant, and by that point he had reasonable suspicion because he had (1) seen an object weighing down Defendant's hoodie pocket, (2) confirmed Defendant was not licensed to carry a firearm, and (3) seen a portion of the weapon itself poking out of the hoodie pocket. (*Id.* at 4–9; *see also* Rough Draft July 30, 2026 Hr'g Tr. at 36:25–40:03.)

On July 30, 2026, the Court held an evidentiary hearing at which Officers Horn and Weiss testified, both officers' body camera footage from the day in question and the transcript of the preliminary hearing from when this action was in state court were introduced, and the Court heard argument from counsel for the Government and Defendant. (*See* Doc. No. 31; Rough Draft July 30, 2026 Hr'g Tr.) The motion is now ripe for resolution.

## III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

To invoke this protection, a defendant challenging a search or seizure through a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant."). The Government must satisfy its burden of proof by a preponderance of the evidence. *See United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

When a search or seizure is in violation of the Constitution, the exclusionary rule precludes evidence at trial that was directly obtained from the search or seizure. *Herring v. United States*, 555 U.S. 135, 139 (2009). Similarly, the "fruit of the poisonous tree" doctrine prevents evidence indirectly flowing from an unlawful search or seizure from being used in a criminal trial. *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018).

## IV. DISCUSSION

Defendant challenges his seizure by Officers Horn and Weiss as unconstitutional. Because "there can be no Fourth Amendment violation until a seizure occurs," the Court must first determine when Defendant was seized within the meaning of the Fourth Amendment. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000); *see United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) ("We begin by determining when the seizure of Brown occurred, as that is the moment 'the Fourth Amendment becomes relevant.'" (quoting *Terry*, 392 U.S. at 16)). "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a

show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

Here, the threshold inquiry is the latter: whether Defendant submitted to a show of authority from Officer Horn during their second conversation by stopping, lifting his shirt, and spinning. The benefits to both parties are clear—if the seizure did not occur until *after* that interaction, we may include Officer Horn's testimony that he saw the firearm in Defendant's pocket in our reasonable suspicion analysis. But if Officer Horn's requests and Defendant's responses constitute a consent to a show of authority, and thus a seizure, they occurred before Officer Horn saw the firearm. In that scenario, the Government would need to rely the officer's admitted "hunch" about Defendant having a firearm, which may be insufficient to show reasonable suspicion. *See, e.g.*, *United States v. Springs*, No. 25cr310, 2026 WL 295742, at *10 (E.D. Pa. Feb. 4, 2026) (granting motion to suppress based upon officer's "hunch" that defendant was carrying a gun in his waistband). Thus, we begin with our analysis of when the initial seizure occurred, before moving to whether it was based on reasonable suspicion, and, finally, whether Defendant's subsequent statements should be barred as fruit of the poisonous tree.

**A. When did the Fourth Amendment "seizure" occur?**

To figure out when the seizure occurred, the Court must first determine whether there was a show of authority made during Officer Horn's second conversation with Defendant. "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Brown*, 448 F.3d at 245–46 (quoting *Hodari D.*, 499 U.S. at 628). This is commonly referred to as the *Mendenhall* test, because it was first laid out by the Supreme Court in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). When applying *Mendenhall*, a court must consider "all of the circumstances surrounding the encounter"

in determining whether "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). And "[a] seizure does not occur every time a police officer approaches someone to ask a few questions. Such consensual encounters are important tools of law enforcement and need not be based on any suspicion of wrongdoing." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut*, 486 U.S. at 573.

But that imprecision does not leave us in uncharted waters. In *Mendenhall*, the Supreme Court identified multiple "examples . . . that might indicate a seizure," including the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554. And in the more than 45 years since *Mendenhall*, the Third Circuit has further mapped out what is and is not a "show of authority." A few examples from each side will assist in charting the course necessary for our analysis.

On the former side of the map are cases where courts have found the officer or officers' actions are a sufficient show of authority. Multiple officers, multiple police vehicles, an excited and unexpected arrival, and commands with weapons drawn are enough to constitute a show of authority. *United States v. Lowe*, 791 F.3d 424 (3d Cir. 2015). In *Lowe*, "three marked police cars" arrived at 4:00 a.m. to a defendant's residence "in a hurried manner," the officers "command[ed]" defendants to "show their hands, and "at least one drew his firearm." *Id.* at 431–32 (cleaned up). An officer ordering a suspect to wait and place his hands on a police car is also sufficient to constitute a show of authority. *Brown*, 448 F.3d 239. In *Brown*, shortly after an evening robbery, two defendants were stopped by a police officer and told to wait so that the

victim could come over and confirm if they were the men who robbed her, "necessarily implying that they were not free to leave." *Id.* at 245; *see also United States v. Smith*, 575 F.3d 308, 314 (3d Cir. 2009) (assuming a show of authority where an officer requested a citizen place his hands on a vehicle). And a late-night request—with police vehicle lights on—to show one's hands is also sufficient. *United States v. Amos*, 88 F.4th 446 (3d Cir. 2023). In *Amos*, "at 2:00 a.m.[,] a marked police car" drove with its lights on against the flow of traffic in order "to get in Amos's path" and then one of the two uniformed officers got out of the car "command[ed] him to stop and show his hands." *Id.* at 452.

On the latter side of the map are cases where courts have given leeway to officers to, as the Third Circuit in *Johnson* stated, "approach[] someone to ask a few questions." 332 F.3d at 205. "Approaching a person and asking him questions on the street does not, without more, effectuate a seizure." *Smith*, 575 F.3d at 313 (citing *United States v. Lockett,* 406 F.3d 207, 211 (3d Cir. 2005)). In *Smith*, the Court found it dispositive that "the two officers were still in their car, neither officer displayed his weapon, there was no physical touching, and no indication as to the language or tone of the officer's voice that might have signaled a clear show of authority." *Id.* at 314; *see also Verdier v. Borough,* 796 F. Supp. 2d 606, 622–23 (E.D. Pa. 2011) (finding "pull[ing] up behind or next to Plaintiff's car with the safety siren activated" and asking multiple questions of the Plaintiff did not constitute a show of authority). And neither is a "polite" request to remove one's hands from one's pockets a show of authority. *United States v. De Castro*, 905 F.3d 676 (3d Cir. 2018). In *De Castro*, a single officer was dispatched to a high crime area in the early evening, and from five to ten feet away, "made a sole, polite, and conversational request for De Castro to remove his hands from his pockets, rather than an order for him to show his hands. No weapons were drawn, and no threats were made." *Id.* at 682; *see*

*also United States v. Williams*, No. 23cr2980, 2025 WL 101068, at *3 (3d Cir. Jan. 15, 2025) (affirming district court finding of no show of authority where officer "was the only officer present at the time; he did not display his badge or weapon; he did not touch [defendant]; he did not verbally command Williams to stop, roll down his window, or show his hands; he did not use his police lights or sirens; he did not block [defendant]'s path; and the interaction was not late at night").

The contours of the map now in view, we turn back to the instant action. And we find the facts here are distinguishable from the circumstances presented in cases like *Lowe*, *Brown,* or *Amos*, and are more in line with cases like *Smith, De Castro*, and *Williams*. So, the Court finds that the second conversation between Officer Horn and Defendant did not constitute a show of authority and a seizure for purposes of the Fourth Amendment.

***First***, the interaction must be placed in the context of the first conversation, where Defendant—both objectively and subjectively—felt free to leave because he did in fact walk away. (*See* Gov't Hr'g Ex. 2 at 11:41:17–11:41:25.) The fact that Defendant was free to leave after a brief conversation with these PPD officers little more than 30 seconds prior to the second conversation supports that a reasonable person would still feel free to leave when Officer Horn re-engages him. ***Second***, the conversation at issue was shortly before noon on a Wednesday in October 2025, in the parking lot of a grocery store. (*See* Gov't Hr'g Ex. 2 at 11:42.) This was not, as in *Lowe* and *Amos*, a late night or early morning encounter. 791 F.3d at 431–432; 88 F.4th at 452. It was a conversation in broad daylight from multiple feet away. (*See* Gov't Hr'g Ex. 1 at 11:42:00–11:42:07; Gov't Hr'g Ex. 2 at 11:42:00–11:42:07.) ***Third***, the officers did not approach Defendant in any "hurried manner," draw their weapons, or direct Defendant to show his hands. *Lowe*, 791 F.3d at 431–432; *see also Smith*, 575 F.3d at 314. To the contrary, even

though Officer Horn had his "hunch" regarding Defendant carrying a weapon, the PPD officers did not turn on their police vehicle's lights, and Officer Horn did not rush out of his vehicle, block, or approach Defendant—he merely opened his passenger side door, stepped one foot out, and, while still behind the passenger side door, spoke with and requested Defendant take an action.[6] (*See* Gov't Hr'g Ex. 2 at 11:42:00–11:42:07); *De Castro*, 905 F.3d at 682. And, while Officer Horn does appear to request Defendant lift his shirt, and indisputably requested Defendant spin around, "the police also may ask a person to do something . . . without necessarily converting the encounter into a seizure." *United States v. Barnes*, 496 A.2d 1040, 1044 (D.C. 1985). So, upon review of all the circumstances surrounding this encounter, the Court finds Officer Horn's request to be analogous to the request in *De Castro*, and thus insufficient to be a show of authority. *See De Castro*, 905 F.3d at 682.

We also find a recent opinion from this District, *United States v. Taylor*, No. 24cr305, 2025 WL 2375242 (E.D. Pa. Aug. 14, 2025), factually analogous and persuasive on this issue. In *Taylor*, the court found there was no show of authority where the officers "asked Taylor one time whether he had a gun," "merely asked Taylor to lift his shirt," used a conversational and non-aggressive tone, and the interaction was "extremely brief." *Id.* at *4. Similarly here, the second conversation between Officer Horn and Defendant was from a few feet away, the officer was behind a car door, Defendant's path was not blocked, no weapon was drawn, and the conversation lasted less than 10 seconds. (*See* Gov't Hr'g Ex. 1 at 11:42:00–11:42:07; Gov't Hr'g Ex. 2 at 11:42:00–11:42:07.) For all of these reasons, the Court finds that a reasonable

[6] There is no evidence in the record regarding the exact words used or tone of voice of Officer Horn during this second conversation. This is because Officer Horn failed to follow the PPD's body camera policy on the day in question. (*See* Rough Draft July 30, 2026 Hr'g Tr. at 7:08–09 ("Q. Did you comply with [PPD body camera] policy that day? A. I did, sort of. . . .").)

person in Defendant's situation would have believed that they were free to leave and there was no show of authority from the PPD officers.

* * *

Having found that Officer Horn's second conversation with and requests to Defendant did *not* constitute a "seizure" for purposes of the Fourth Amendment, we thus need to identify when the purported seizure occurred and whether it was supported by reasonable suspicion. The seizure clearly occurs shortly after this conversation, when Officer Horn physically grabs hold of Defendant and begins to frisk him in a search for the firearm. (*See* Gov't Hr'g Ex. 1 at 11:42:17–11:42:18); *Terry*, 392 U.S. at 19 n.16. At this moment, Defendant's liberty is being restrained, and the encounter has turned into the type of situation that implicates the Fourth Amendment. *See generally Terry*, 392 U.S. at 19–21. Thus, the Court's reasonable suspicion analysis will continue from this point.

**B. Was the seizure based upon reasonable suspicion?**

Yes. As discussed above, "we must consider the totality of the circumstances—the whole picture" when evaluating whether a seizure and a frisk were supported by reasonable suspicion. *Valentine*, 232 F.3d at 353. Further, to conduct the frisk, Officer Horn needed "a reasonable belief that [Defendant was] armed and presently dangerous." *United States v. Murray*, 821 F.3d 386, 393 (3d Cir. 2016) (cleaned up). Prior to laying his hands on Defendant, Officer Horn had (1) seen a bulge weighing down Defendant's hoodie; (2) had verbally confirmed that Defendant did not have a license to carry; and (3) just before his approach, "noticed the back of the firearm in the side of [Defendant's] pocket." (Rough Draft July 30, 2026 Hr'g Tr. at 6:09–16; 8:08–21.) Officer Horn's testimony on the last of those is further buttressed by the body camera footage, which shows him reacting to and pointing at Defendant with his left hand immediately after Defendant completed his spin, (*see* Gov't Hr'g Exs. 1, 2 at

11:42:07–11:42:08), and the audio from Officer's Weiss body camera, on which Officer Weiss can be heard stating "you can see the mag, bro" only seconds after Defendant spun around (Gov't Hr'g Ex. 2 at 11:42:28–11:42:33).[7] Upon consideration of the totality of the circumstances here, and especially in light of the "considerable deference to police officers' determinations of reasonable suspicion" that courts give, we find there was more than reasonable suspicion for Officer Horn to stop and frisk the Defendant at that point.[8] *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006); *see also United States v. Goode,* 486 F. App'x 261, 264 (3d Cir. 2012) ("[T]he police only needed a reasonable suspicion that they were dealing with an armed and dangerous individual to permit a reasonable search for weapons.") (cleaned up); *United States v. Kelly-Sizer*, No. 20cr297, 2021 WL 1293563, at *7 (E.D. Pa. Apr. 6, 2021) (finding search justified when officer "saw [a] bulge in Kelly-Sizer's pocket, at which point it was apparent to him that the object poking out of the pocket was an extended magazine . . . .")

---

[7] During the July 30, 2026 evidentiary hearing, defense counsel elicited testimony from Officer Weiss, and introduced evidence (Def. Hr'g Ex. 1) that made clear Officer Weiss had testified incorrectly during the preliminary hearing in state court. (*See* Rough Draft July 30, 2026 Hr'g Tr. at 27:13–31:22.) Specifically, Officer Weiss stated he, instead of Officer Horn, was the one who recovered the firearm at issue in this case. (*Id.* at 28:14–16.) Defense counsel stated this inconsistency creates a "credibility issue" for the PPD officers here. (*Id.* at 36:18.) The Court declines to credit this line of inquiry and disagrees it creates a credibility issue. Officer Weiss admitted on the stand that he "made a mistake" in his state court testimony, and clarified he meant only that he prepared the property receipt for the firearm. (*Id.* at 30:18–31:16.) And the body camera footage unambiguously shows it was in fact Officer Horn who first recovered the firearm here. (*See generally* Gov't Hr'g Ex. 1.)

[8] The Court credits Officer Horn's account that he saw the firearm at issue here shortly after Defendant lifted his shirt and Officer Horn directed Defendant to spin. But we must note with concern that there were a few discrepancies between his testimony and the body camera footage entered into evidence. (*Compare* Rough Draft July 30, 2026 Hr'g Tr. at 15:22–16:02 (stating he was in the car during both conversations with Defendant), *with* Gov't Hr'g Ex. 2 at 11:42:00–11:42:03 (showing he opened the door and stepped out of the car); *compare* Rough Draft July 30, 2026 Hr'g Tr. at 17:20–25 (denying he directed the Defendant to do a spin in the second conversation), *with* Rough Draft July 30, 2026 Hr'g Tr. at 24:01–08 (admitting, only after watching Officer Weiss' body camera footage (Gov't Hr'g Ex. 2), that he directed Defendant to spin around).) These inconsistencies, and Officer Horn's failure to follow procedure, discussed in footnote 6 *supra*, are troubling, but do not change the Court's determination that in light of the totality of the circumstances, Officer Horn's conversation with and request to Defendant did not constitute a show of authority.

### C. Should Defendant's post-arrest statements be suppressed?

No. Because the Court finds that the initial seizure of Defendant—Officer Horn laying hands on him just outside the Fresh Grocer—was supported by reasonable suspicion, we also find that Defendant's statements to police shortly after his arrest are not fruit of the poisonous tree and need not be suppressed. The exclusionary rule only applies to "evidence obtained incident" to an unconstitutional seizure, not evidence flowing from a lawful *Terry* stop and arrest. *Hester*, 910 F.3d at 84. Here, Defendant was detained and searched, a firearm was found on his person, and he was subsequently arrested because he had previously admitted he did not have a permit to carry such a firearm. His statements to police shortly after that incident will not be suppressed.

## V. CONCLUSION

Upon a review of the totality of the circumstances, the Court finds that Defendant was not seized and searched by Officer Horn until after the officer saw a portion of a firearm sticking out of Defendant's hoodie pocket. As such, Officer Horn had reasonable suspicion to detain Defendant based upon his observations and prior interactions with Defendant. And, because the search and seizure were based on reasonable suspicion, Defendant's post-arrest statements were also properly obtained. Accordingly, the Court denies Defendant's motion to suppress. An appropriate Order follows.